UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| DEBRA E. BLACK,<br>(Social Security No. XXX-XX-8433),<br><br>    Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE, COMMISSIONER<br>OF SOCIAL SECURITY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) 2:08-cv-392-WGH-RLY<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 14, 20) and an Order of Reference entered by District Judge Richard L. Young on February 26, 2009 (Docket No. 21).  The parties have filed their briefs (Docket Nos. 19, 24, and 25), and the Magistrate Judge heard oral arguments on August 19, 2009, at which the Plaintiff was represented by counsel, Patrick Harold Mulvany, in person, and the Defendant was represented by counsel, Deepa Rajkarne, by telephone.

**I. Statement of the Case**

Plaintiff, Debra E. Black, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§

416(i), 423(d); 20 C.F.R. § 404.1520(f). This court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on June 27, 2005, alleging disability since August 30, 2004. (R. 89). The agency denied Plaintiff's application both initially and on reconsideration. (R. 27-29, 32-36). Plaintiff appeared and testified at a hearing before Administrative Law Judge Joan Knight ("ALJ") on June 10, 2008. (R. 275-302). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 275). On July 25, 2008, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 10-16). After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner. (R. 3-5). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on October 9, 2008, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Plaintiff was 50 years old at the time of the ALJ's decision and had an eleventh-grade education. (R. 15). Her past relevant work experience included work as a car detailer and janitor, both of which were at the medium exertional level. (R. 16).

**B. Medical Evidence**

    **1. Plaintiff's Physical Impairments**

Plaintiff was admitted to Putnam County Hospital on September 22, 2003, with complaints of chest pain. (R. 128-29). Upon examination by Thomas Black, M.D., Plaintiff's primary care physician, Plaintiff was in no obvious distress. (R. 128).

On September 24, 2003, Primo A. Andres, M.D., a cardiologist, performed a cardiac catheterization, which showed left anterior descending myocardial bridge. (R. 139-41, 217-18). It was also noted that Plaintiff had an abnormal resting electrocardiogram with mild ST segment depression in inferolateral leads which led to the recommendation that she undergo a cardiac stress test. (R. 139). Plaintiff was diagnosed with angina pectoris, coronary artery disease, hyperlipidemia, hypertension, and microcytic hypochromic anemia. (R. 139).

On May 12, 2004, Plaintiff was admitted to the hospital for chest pain. (R. 153-54). A chest x-ray showed no evidence of active pulmonary disease. (R. 204). An exam revealed no heart murmurs, gallops, lifts, or thrills. (R. 153). Plaintiff was oriented and alert and her cranial nerves were grossly intact. (R. 153). Plaintiff could walk, climb stairs, bathe, dress, and eat without assistance. (R. 200). Dr. Black noted that Plaintiff had been admitted in September 2003 for a similar complaint. (R. 153). Since then, Plaintiff had a fairly extensive work-up that was "essentially benign." (R. 153).

On May 18, 2004, Plaintiff visited Dr. Andres for chest pain and arm numbness. (R. 217-18). She had normal respiratory rate and rhythm and took two nitroglycerins for the pain. (R. 217). Her assessment was anxiety with stress and unspecified chest pain. (R. 218).

On August 5, 2004, Dr. Calhoun, a radiologist, noted that an MRI revealed no disc herniation in the neck or lower back; bulging discs at C5-6, L3-4, L5-6, and L5-S1; and mild osteoarthritis. (R. 248). An August 6, 2004 document also noted degenerative disc disease. (R. 147, 270).

On August 26, 2004, physical therapist Srinivasan Sankaran evaluated Plaintiff, who reported back pain that was an eight on a scale of one to ten. (R. 148). Plaintiff's pain radiated into her right leg, and she also had decreased muscle strength in the right leg and abdominal muscles; she also demonstrated reduced trunk range of motion. (R. 148). Sankaran recommended physical therapy. (R. 148). On September 2, 2004, Plaintiff cancelled her physical therapy appointment because she was not feeling well. (R. 196). On September 13, 2004, and September 20, 2004, Plaintiff cancelled her physical therapy appointments. (R. 196-97).

On September 24, 2004, Plaintiff saw G. Andrew Wilson, M.D., a neurosurgeon, for complaints of low back pain, sciatic notch pain, and numbness in her thigh, leg, and foot. (R. 245). Dr. Wilson reported that a back exam revealed no midline defects and that Plaintiff's muscle strength was 5/5 for all groups tested. (R. 245). A neurological exam showed bilateral positive

reverse straight leg raising. (R. 245). Plaintiff's patellar reflex and bilateral Achilles reflex was 3/4. (R. 245). An MRI revealed prominent bulging at L3-4. (R. 245).

On October 5, 2004, Gary D. Rusk, M.D., a neurologist, noted Plaintiff's abnormal nerve conduction study results for Plaintiff's left arm showed bilateral carpal tunnel syndrome. (R. 249-50). There was no evidence of neuropathy or cervical radiculopathy. (R. 250).

On October 14, 2004, Sankaran wrote a letter to Dr. Black after five physical therapy treatment sessions. (R. 148). Plaintiff complained of pain radiating into her right lower extremity. (R. 148). Plaintiff had restriction of her trunk range of motion and decreased muscle strength in both her right lower extremity and abdominal muscles. (R. 148). Plaintiff had minimal relief with therapy. (R. 148). She planned to see a neurologist and discontinued therapy. (R. 148).

On October 25, 2004, an x-ray report noted grade I spondylolisthesis L5-S1; no evidence for instability; and possible bilateral pars defects. (R. 269). Also on that date, Plaintiff visited Thomas Leipzig, M.D., a neurosurgeon. (R. 150-52). Plaintiff was taking Vicodin, which seemed to help her back and leg pain. (R. 150). Plaintiff could heel and toe walk across the room without a loss of balance. (R. 151). She was somewhat hyperreflexic, but equal bilaterally with knee reflexes at 3-4+. (R. 151). Her gait was satisfactory and she had a full range of hip and knee motion on both sides. (R. 151). With her right leg,

Plaintiff had negative straight leg and cross straight leg raising, stable joints, and 5/5 leg strength. (R. 151). With her left leg, Plaintiff had a markedly positive Lasègue's sign at 45 degrees, negative cross straight leg raising, stable joints, and no sign of atrophy. There also was a global overall decrease in strength that was secondary to apprehension. (R. 151). Plaintiff had a full range of motion in her back with no pain with 45 degrees of flexion, extension, or lateral rotation. (R. 151). The overall assessment was lower back pain with left radicular symptoms. (R. 152). On October 25, 2004, it was noted that Plaintiff was not ready to return to work, but that Plaintiff's prognosis was good. (R. 44).

On October 26, 2004, Plaintiff received a left L5 nerve root injection. (R. 258-59). On October 28, 2004, Plaintiff indicated that her back pain felt "so much better." (R. 149). Plaintiff could sit in a chair and was able to walk. (R. 149). On November 26, 2004, Plaintiff had a L5 selective nerve root block on her left side, which "helped tremendously." (R. 274). On November 29, 2004, Harry Cliff Walker, a Physician Assistant-Certified, noted that Plaintiff's nerve root injection lasted for approximately two weeks and there was then a gradual return of symptoms, but the symptoms were much better than prior to the block. (R. 178). Plaintiff was released to work the following Monday with a 50-pound lifting restriction. (R. 178).

On December 16, 2004, Plaintiff returned to work. (R. 176). Her schedule included 40 hours of regular time plus 16 hours of overtime. (R. 176). On January 3, 2005, Plaintiff's back was struck by a rack at work and she

consequently stopped working. (R. 179). On January 10, 2005, Plaintiff walked with a limp and experienced left-side spine pain and numbness. (R. 176).

On January 27, 2005, Plaintiff visited Dr. Leipzig and reported severe leg pain which was a nine to ten on a scale of one to ten. (R. 179). Straight leg raising in the seated position was positive on the left side. (R. 179). On January 31, 2005, it was noted that Plaintiff's diagnosis was lumbar disc displacement with radiculopathy. Plaintiff received a L5 nerve root injection. (R. 254-55).

On February 24, 2005, Physician Assistant Walker noted that Plaintiff's second nerve root block did not provide as much relief as did the first one; Plaintiff reported being in pain and getting much worse. (R. 180). Walker recommended a CT myelogram. (R. 180). Also on February 24, Walker noted "lumbar disc displacement" on Plaintiff's Request for Extension of Medical Leave of Absence form. (R. 45). He stated that Plaintiff's prognosis was "good," but that she likely would require surgery. (R. 45). He also noted that Plaintiff could return to light work (with a ten-pound lifting limit) for less than 20 hours per week and would not be able to return to full duty for at least three months. (R. 45).

On March 4, 2005, Plaintiff had a spine myelogram and a lumbar spine CT scan. (R. 265-66). This showed: broad disc protrusion at L3-L4 creating mild dural sac compression without significant stenosis; mild diffuse annular bulging at L4-L5; broad disc protrusion at L5-S1 with a moderate degree of neural foraminal compromise especially on the left due to broad protrusion and

spondylolisthesis. (R. 265). The assessment was: (1) Grade I anterior spondylolisthesis of L5 to S1 which is associated with bilateral chronic pars defects of L5 and associated broad disc protrusion creating significant left neural foraminal compromise and probable impingement on the exiting left L5 nerve; and (2) broad disc protrusion posteriorly at L3-L4 creating mild dural sac compromise without significant stenosis. (R. 266).

On March 28, 2005, Plaintiff's chest x-ray revealed no apparent distress. (R. 174).

On April 6, 2005, Dr. Leipzig noted that Plaintiff had mild grade I spondyloisthesis. (R. 175). Plaintiff also had possible mild left neural foraminal compromise on the left side. (R. 175). Dr. Leipzig was hesitant to consider surgery because Plaintiff's condition could create problems regarding the development of instability. He started her on a home exercise program and Neurontin for her leg pain. (R. 175).

On May 9, 2005, Plaintiff returned to Dr. Leipzig's office and worked with Physician Assistant Walker on her low back pain and leg pain. (R. 251). Walker noted that the Neurontin had helped achieve "significant improvement." (R. 251). Plaintiff reported that, during the prior week, she was able to do laundry and mop the floor, which seemed to flare things up a bit. (R. 251). Dr. Leipzig noted "Lumbar Radiculopathy 722.1" on Plaintiff's return to work form with a fair prognosis. (R. 47). He stated that Plaintiff could return to work on May 16,

2005, with the following restrictions: 20 pound lifting limit; one-hour sitting limit. (R. 47).

On May 28, 2005, Plaintiff returned to Dr. Black's office for right-side chest pain. (R. 177). She was prescribed medications and instructed to return to the clinic if not better in one week. (R. 177).

### 2. State Agency Review

On September 1, 2005, Dr. W. Bastnagel, a state agency reviewing physician, filled out a Physical Residual Functional Capacity Assessment Form. (R. 187-94). Dr. Bastnagel noted degenerative disc disease in the cervical and lumbar spine and osteoarthritis in the lumbar spine. (R. 188). Dr. Bastnagel found that Plaintiff could: occasionally lift no more than 20 pounds; frequently lift no more than ten pounds; stand and/or walk and sit for about six hours in an eight-hour workday; and push/pull on an unlimited basis. (R. 188). Dr. Bastnagel also noted that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, but had no manipulative, visual, communicative, or environmental limitations. (R. 188-91). On October 7, 2005, Dr. M. Brill, a state agency reviewing physician, made the same findings. (R. 194).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also Perkins v.*

*Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant

work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

### V. The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 30, 2004, and that Plaintiff was only insured for DIB through June 30, 2006. (R. 15). The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had eight impairments that are classified as severe: a bulging cervical disc; lumbar spondylolisthesis; L5 spondylosis; a herniated nucleus pulposus; asthma; hypertension; chest pain suggestive of angina; and carpel tunnel syndrome. (R. 15). The ALJ concluded that none of these impairments met or substantially equaled any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15). The ALJ then found that Plaintiff retained the following residual functional capacity: lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk six hours in an eight-hour day; sit six hours in an eight-hour day; unlimited ability to push/pull; occasional ability to climb, balance, stoop, kneel, crouch, and crawl; frequently handle and finger; and unable to forcefully grip or grasp. (R. 15). Furthermore, the ALJ determined that Plaintiff's complaints were not fully credible. (R. 15). The ALJ determined that, based on

her residual functional capacity, Plaintiff could not perform her past work. (R. 15). The ALJ determined, however, that Plaintiff did retain the residual functional capacity to perform a significant number of jobs in the regional economy, including unskilled light jobs as receptionist, general office clerk, and security monitor. (R. 16). The ALJ, therefore, concluded that Plaintiff was not under a disability. (R. 16).

## VI. Issues

Plaintiff has raised five issues. The issues are as follows:

1. Was Plaintiff denied due process?

2. Did the ALJ fail to properly consider Listing 1.04A?

3. Did the ALJ err by failing to summon a medical expert?

4. Is the ALJ's credibility determination patently wrong?

3. Is the ALJ's RFC finding supported by substantial evidence?

**Issue 1:    Was Plaintiff denied due process?**

Plaintiff argues that the Commissioner's decision must be reversed because the ALJ, acting without a medical advisor, arbitrarily rejected all of the evidence proving disability and simply rubber-stamped the erroneous opinions of the agency's non-examining, non-treating physicians. (Plaintiff's Brief at 18).

The court concludes that the ALJ's decision did not deny Plaintiff due process. This court in *Reese v. Astrue,* 2009 WL 499601 (S.D. Ind., Feb. 27, 2009), has recently concluded: "It is not a per se due process violation for an ALJ to reject evidence supporting a finding of disability, to decide not to give the

opinions of treating physicians controlling weight, [or] to not specifically discuss all of the evidence . . . ." *Id.* at *4.

In this case, the ALJ does not explicitly recite to every piece of evidence in the record, but the ALJ's summary of the evidence (found at the last two paragraphs of the transcript at pages 12-13) establish that the ALJ examined the record as a whole and fairly summarized the ultimate conclusions of the doctors from those records. The court concludes that this is not a case in which the ALJ intentionally ignored evidence of record in order to reach a result. Plaintiff was not denied due process.

**Issue 2:     Did the ALJ fail to properly consider Listing 1.04A.**

Plaintiff's next argument is that the ALJ committed error when she failed to address whether or not Plaintiff's impairment met Listing 1.04A of 20 C.F.R. Part 404, Subpart P, Appendix 1. That particular Listing provides that individuals with the following impairment are presumptively disabled:

> 1.04  *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); . . . .

In this instance, the ALJ stated that she considered several listings including "those found in sections 1.00, 3.00, 4.00, and 11.00" and concluded that

Plaintiff's impairment did not meet any listing. (R. 11). To meet or equal Listing 1.04A, all of the criteria must be met. *See Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006). In addition to meeting the listing, the impairment must have lasted or must be expected to last for a continuous period of at least 12 months. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §1.00.B.2 (specifying that the listing level clinical findings in that instance – the inability to ambulate effectively or the inability to perform fine and gross movement effectively – must have lasted, or be expected to last, at least 12 months.)

The evidence cited to by Plaintiff in her brief, at pages two through the first half of page ten, are pieces of evidence which show that sporadically and at some points in time Plaintiff experienced symptoms which may have met the listing. However, the final piece of evidence before Plaintiff's date of last insured status (stipulated by the parties to be June 30, 2006) is the report of Dr. Leipzig dated May 9, 2005. That record reflects that a treating physician believed that Plaintiff could return to work with certain restrictions (maximum 40 hours per week and 20 pound lifting limits; no sitting for greater than one hour at a time) and was expected to be able to return to normal work within two to three months. This is sufficient evidence from which a reasonable person could conclude that the symptoms which might show that Listing 1.04A was met did not exist for a 12-month period.

There is no further treatment for Plaintiff's spinal conditions thereafter. Although Plaintiff has argued that the ALJ did not properly inquire as to the

reason for no medical treatment being received (in this case, because she was uninsured and had no ability to obtain further treatment), Dr. Leipzig's opinion at page 47 of the record is substantial evidence upon which the ALJ could conclude that Plaintiff did not meet Listing 1.04A for a continuous 12-month period.  Therefore, there was no error in failing to find that Plaintiff met this listing.  Although it would have been better for the ALJ to explicitly discuss that listing, the court can trace the path of the ALJ's reasoning that she considered this listing by virtue of her discussion in the last paragraph of page 11 of the record where she refers to section 1.00 and the first paragraph of page 12 of the record where she refers to neurological examinations and the positive straight leg raise test.

It should be mentioned that Plaintiff's use of a cane did not begin until 2007, and that use would not have been evidence which must have been considered by the ALJ when evaluating Plaintiff's condition as of June 30, 2006.  Therefore, the court finds no error with respect to this issue.

**Issue 3:    Did the ALJ err by failing to summon a medical expert?**

Plaintiff argues that the ALJ erred by not summoning a medical expert to testify whether Plaintiff's impairments met or equaled the listing.  The court notes that it is within the ALJ's discretion to obtain expert opinions.  *Clifford v. Apfel,* 227 F.3d 863, 873 (7th Cir. 2000); *see* 20 C.F.R. § 404.1527(f)(2)(iii) (Administrate Law Judges may also ask for and consider opinions from medical experts . . . .)  Case law indicates that obtaining a medical consultant is not

necessary where the file contains extensive medical records and is required only when medical evidence about a claimed impairment is insufficient.  *Skinner v. Astrue,* 478 F.3d 836 (7th Cir. 2007).

In this case, the ALJ has fully developed the record (*i.e.,* she obtained all necessary medical evidence from Plaintiff's treating providers); there are extensive records from Dr. Wilson and Dr. Leipzig.  There is no error in failing to require a medical consultant to be at the hearing.

**Issue 4:     Is the ALJ's credibility determination patently wrong?**

Plaintiff also argues that the ALJ conducted an improper determination of Plaintiff's credibility.  An ALJ's credibility determination will not be overturned unless it is "patently wrong."  *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000).  However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain.  Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms.  The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms.  If there is no medically determinable physical or mental impairment(s), or if

> there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

Social Security Ruling 96-7p (emphasis added). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant including:  (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(I)-(vii).

The ALJ does briefly recite to SSR 96-7p.  (R. 12).  The ALJ did not explicitly evaluate Plaintiff's pain under the criteria established by that listing. The ALJ does discuss Plaintiff's pain at pages 12 and 13 of the record and concludes that description by saying, "It would appear to the undersigned that if the claimant's medications are not efficacious, she would be reporting this fact to Dr. Black for a possible change in treatment or prescriptions."

Plaintiff argues that it is improper for the ALJ to conclude that pain is not severe because there is a lack of medical treatment, particularly when a claimant is uninsured.  However, the ALJ did review the record and established that Plaintiff had continued to see Dr. Black up to and including a time in November

2007.  While it may be an error for the ALJ to assume that pain no longer exists when there is no medical treatment (because the lack of treatment may be due to a lack of ability to receive treatment), it is not, however, error to recite the fact that a treating family physician has failed to provide new or different pain medication.  The record reflects (R. 41) that Plaintiff was seen by Dr. Black during 2006 and 2007.

While it would have been a more thorough opinion by the ALJ to have addressed the SSR 96-7p factors, the court can trace the path of the ALJ's reasoning in this case.  The last medical examinations of Plaintiff which exist prior to her date last insured do not reflect uncontrolled pain, and the ALJ has recited to that evidence.  This is not an instance in which the court can conclude that the ALJ was patently wrong with respect to the credibility assessment, and there is no error with respect to this matter.

**Issue 5:     Is the ALJ's RFC finding supported by substantial evidence?**

Plaintiff argues that there is no substantial evidence to support the ALJ's erroneous step 5 determination and that the ALJ relied upon improper hypothetical questions asked of the vocational expert in this case.  However, the court concludes that the first hypothetical question posed to the vocational expert at page 296 of the record is a proper hypothetical question that encompassed all of the restrictions which the ALJ ultimately found to be present in this case.  The vocational expert responded to that question that there would be some jobs available to a person with that residual functional capacity.

It is true that the vocational expert eliminated those jobs as available to Plaintiff if she also needed to be able to alternate sit/stand at will. (R. 298). However, Plaintiff's restrictions – which might require a sit/stand at will option (particularly the use of her cane) – did not exist at the date of last insured on June 30, 2006. The ALJ was not required to incorporate those conditions in the hypothetical question posed to the vocational expert. There is no error, and substantial evidence supports the ALJ's finding in that regard.

## Conclusion

For the reasons stated above, there is no error in the ALJ's decision. The Commissioner's decision is **AFFIRMED,** and this case is **DISMISSED.**

**SO ORDERED** this 28th day of October, 2009.

　　　　　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　William G. Hussmann, Jr.
　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge
　　　　　　　　　　　　　　　　　　　　Southern District of Indiana

**Electronic copies to:**

Patrick Harold Mulvany
mulvany@onet.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov